COPE, Judge.
Linda Bass appeals an order revoking her criminal justice certification. We reverse.
As summarized in the concurring opinion in the prior appeal of this case:
Mrs. Bass was hired as a Dade County Corrections Officer in 1982. Over the years she built a fine employment record receiving numerous commendations and outstanding performance evaluations. Mrs. Bass selected August 8, 1990, as the date for her biannual physical examination which included an alcohol and drug test. According to the laboratory, her urine sample tested positive for the presence of cocaine. On the basis of the test result, she was terminated from employment.
When Mrs. Bass learned of the results of the urine test, she voluntarily underwent further drug testing. The results of these subsequent tests, which included a hair analysis test, showed no evidence of cocaine use. Included in the results was a report by Dr. Werner Baumgartner which suggested a scientific basis for a false positive reading on the August 8th urinalysis test.
At a formal hearing requested by Mrs. Bass, she sought to introduce evidence of the hair analysis test and the letter from Dr. Baumgartner explaining how a false positive reading could have been obtained *1172 on the urinalysis. The hearing officer refused to admit this evidence.
Bass v. Florida Department of Law Enforcement, Criminal Justice Standards and Training Commission, 627 So.2d 1321, 1321-22 (Fla. 3d DCA 1993) (Ferguson, J., concurring). This court ruled that the hair analysis testimony had been erroneously excluded, reversed the final order, and remanded for further proceedings. See id. at 1321. After a hearing on remand, the hearing officer again recommended revocation of criminal justice certification. The Criminal Justice Standards and Training Commission entered a revocation order, and Ms. Bass has appealed.
Ms. Bass’s expert, Dr. Baumgartner, resides in California. At the time of the remand, Ms. Bass was without funds to pay the expert or bring him to Florida. Dr. Baum-gartner agreed to testify pro bono. The hearing officer directed the Department to determine whether it would stipulate to the admission of Dr. Baumgartner’s report into evidence in lieu of his testimony or whether it would be necessary to take Dr. Baumgart-ner’s testimony in California.
Ultimately, an agreement was reached, and a pretrial order was entered, as follows:
2. Respondent’s [Bass’s] additional evidence will consist of only (1) the letter from her private doctor regarding her urine analysis, (2) the report regarding Respondent’s hair analysis authored by Werner A. Baumgartner, Ph.D., and (3) a January, 1991, letter from Dr. Baumgart-ner to Respondent. Those documents will be admitted in evidence without objection pursuant to Petitioner’s agreement that those documents summarize the testimony those two individuals would give if they were to testify in person.
(Emphasis added). The Department was then permitted to call Dr. Lee Hearn, of the Dade County Medical Examiner’s Office, as a rebuttal witness.
At the administrative hearing conducted on remand, Dr. Baumgartner’s report was introduced into evidence. The report indicated that his laboratory had tested Ms. Bass’s hair sample for a number of substances, including cocaine, and that none was detected. The hair sample had been collected from Ms. Bass approximately sixty days after her routine employment urinalysis which she had failed. Also introduced was the result of a urine test administered by Ms. Bass’s personal physician approximately seven days after the employment urine test. The urine test administered by the personal physician was also negative for cocaine.
The Department’s rebuttal witness, Dr. Hearn, is the laboratory director at the Dade County Medical Examiner Department. He explained that errors in drug testing can occur “either by contamination at some point during the analytical process or by clerical error, like mixing up the sample numbers and recording the results on the wrong sample.” The laboratory conducts hair analysis and finds it “useful for testing the validity of urinalysis.” Dr. Hearn explained that in a controlled experiment, it had been shown that a single dose of cocaine could be detected in the hair for six months thereafter.
With regard to challenging a positive urine test, Dr. Hearn said:
As a means of countering a urine test, sometimes hair analysis may be the only way to get at the time frame and the issue of whether a person used the drug at some time point, because you can’t go back and get a urine sample that is relevant. You may by looking at an appropriate portion of the hair, you may be able to determine whether or not that person had a significant exposure to the drug. In the context of doing that, hair analysis can detect a person’s regular, that is repeated drug use.
I may or may not be able to detect a single exposure. We don’t know unless we know the sensitivity of the test and various other factors that are not developed yet as far as the research on hair testing.
Dr. Hearn was familiar with Dr. Baum-gartner’s work in the field of hair analysis. Dr. Hearn opined that Dr. Baumgartner had made “a worthwhile contribution to the field of toxicology ... [and] ... has advanced the field of forensic science.” Dr. Baumgartner and other scientists in the field have published studies on hair analysis in peer-reviewed scientific journals. “[T]he procedure of hair *1173 analysis is gaining acceptance when it is properly applied and under proper controls, as being a reliable means to detect drugs in the hair samples from individuals.” See also Andre A. Moenssens, James E. Starrs, Carol E. Henderson & Fred E. Imbau, Scientific Evidence in Civil and Criminal Cases .section 14.16(c)(4th ed.1995).
In her supplemental recommended order, the hearing officer concluded that Dr. Baum-gartner’s evidence should be disregarded. First, the hearing officer concluded that Dr. Baumgartner’s report was deficient because it did not state what cutoff level was used for the hair analysis test. The hearing officer overlooked the fact that the cutoff level was stated in Dr. Baumgartner’s letter, which was introduced into evidence.
The hearing officer also ruled that the report could not be considered because Ms.. Bass had not established the chain of custody for the hair sample. Assuming this argument was available to the Department at all,[2] it was not timely raised. After this court’s remand, the Department agreed that Dr. Baumgartner’s report “will be admitted in evidence without objection .... ” (Emphasis added). If the Department had wished to raise a question about chain of custody, it should have raised the issue at that time instead of stipulating to the admissibility of the report. See Hampton v. State, 680 So.2d 581, 584 (Fla. 3d DCA 1996); SKF Management v. Unemployment Appeals Comm’n, 664 So.2d 345, 347 (Fla. 5th DCA 1995); Armbruster v. State, 453 So.2d 833, 834 (Fla. 4th DCA 1984). After the record had closed and after it was too late for Ms. Bass to address the chain of custody issue, the Department for the first time in its proposed order claimed that Dr. Baumgartner’s report should be disregarded because Ms. Bass had failed to establish chain of custody. Ms. Bass was unfairly ambushed by this belated argument. See SKF Management, 664 So.2d at 347.
The hearing officer concluded that Dr., Baumgartner’s report should be disregarded because it was hearsay. Again, we disagree. In order to simplify the proceedings, the Department had agreed that the report and letter were admissible, without objection, in lieu of live testimony. Assuming a hearsay objection could have been made, it was waived.
The hearing officer also accepted the Department’s argument that the hair analysis should be disregarded because of an absence of evidence of the laboratory procedures employed. Here, too, the Department’s original stipulation of admissibility of the hair analysis was followed by after-the-fact challenges which Ms. Bass did not have the opportunity to meet. The hearing officer went on to rule that Ms. Bass’s urine analysis performed by her private physician should not be considered for reasons similar to those outlined above.
We acknowledge that in attempting to simplify the proceedings, the hearing officer acted from the best of motives. The hearing officer was cognizant of Ms. Bass’s limited financial means arid the fact that, during the remand, Ms. Bass was representing herself. The hearing officer desired to arrive at a method of simplifying the case so as to keep it manageable for all concerned. The end result, however, was a proceeding that operated to deprive Ms. Bass of a fair opportunity to have her expert hair and urinalysis evidence considered.
We reverse the revocation order and remand for a new hearing. The time has come for the Department and the hearing officer to squarely confront the questions whether (a) Ms. Bass’s expert evidence shows the 1990 urinalysis to be unreliable, and (b) whether viewed as a whole, the evidence falls short of the clear and convincing standard which must be met in order to revoke a law enforcement certification.[3] See Newberry v. Fla. Dept. of Law Enforcement, Criminal Justice Standards and Training Comm’n, *1174 585 So.2d 500, 501 (Fla. 3d DCA 1991). There must be a properly developed record on the scientific issues, and Ms. Bass’s experts should be heard live, at least by telephone, if at all possible.
At bottom, our concern is that this controversy be decided on the merits, and not on the basis of belated procedural objections. Here the employee was an eight-year veteran" with a strong employment record, who had always passed previous drug screenings. She has brought forward evidence in the form of a hair analysis by a nationally recognized expert, as well as a private urinalysis performed by her own physician as soon as she learned of the positive drug test. The Department’s own expert acknowledged that this type of hair analysis is precisely the tool which is used when there is a claim of error in a urinalysis for cocaine. This ease should be resolved on the merits, on a fully developed record.
Reversed and remanded.

. It may well have been foreclosed by our reversal in the earlier appeal of the exclusion of the expert report.

. The Department has a responsibility to enforce its standards but, as a public agency, also has a responsibility to conduct an appropriate and thorough inquiry where it appears that someone has been wrongly accused, to the end that one wrongly accused will be vindicated.